[No. 25267-4-I.   Division One.   November 5, 1990.]

CLEVCO, INC., ET AL, *Appellants*, v. MUNICIPALITY OF METROPOLITAN SEATTLE, *Respondent*.

Richard S. Twiss, Jeffrey A. Beaver, John Alkire, Gretchen Baumgardner, and Perkins Coie, for appellants.

Stephen A. Smith, Thomas H. Wolfendale, and Preston Thorgrimson Shidler Gates & Ellis, for respondent.

PEARSON, J.*—Appellant Clevco, Inc., and its principals, James and Kaycee Clevenger and Kenneth and Brenda Clark (Clevco) appeal the trial court's order granting summary judgment in favor of respondent Municipality of Metropolitan Seattle (Metro) on Metro's motion and dismissing all of Clevco's alleged causes of action arising out of a wastewater sewer construction project in Medina and Bellevue. We hold that the trial court incorrectly interpreted the contract and that summary judgment should not have been granted.

In January of 1985 Metro issued a solicitation of bids for the construction of an underground sewer main in Medina. Accompanying the solicitation were the plans, specifications and drawings for the project. The plans and specifications contained information indicating the location of underground utilities in the vicinity of, and potentially conflicting

---

*Judge Vernon R. Pearson is serving as a judge pro tempore of the Court of Appeals pursuant to RCW 2.06.150.

with, the proposed sewer. Only two major conflicts appear to have been indicated on the plans and specifications. Clevco relied on the plans and specifications in figuring the bid on the project, although the contract documents purported to inform the bidders that the information on the utility locations might not be complete. On the basis of the documents Clevco estimated that the job would take 2,600 labor hours to complete. Clevco submitted a bid of $1,574,900. On May 17, 1985, Clevco received notice that it had been awarded the contract, and on June 17, 1985, Metro instructed Clevco to begin performance.

In the course of performance Clevco discovered that there were numerous major utility conflicts with the planned sewer. As a result of these conflicts Clevco expended a total of more than 8,400 hours of labor on the project. Clevco's complaint alleged eight theories of recovery arising out of the construction project, including breach of contract, negligence and negligent misrepresentation and tortious interference with contractual relationships. The gist of Clevco's arguments is that Metro had breached the contract by failing to pay Clevco for the "extra" work resulting from the utility conflicts that had not been indicated in the construction plans, that Metro's employees owed a duty to Clevco to prepare the construction plans so as to show all of the existing utility conflicts, and that Metro's failure to pay Clevco for the extra expenses incurred as a result of the utility conflicts rendered Clevco unable to complete a separate construction contract causing a loss of the profits associated with that project.

Metro filed motions for summary judgment addressed to all of Clevco's theories of recovery, dividing Clevco's arguments into three inclusive theories: contract claims; non-contract claims; and claims for consequential damages. The trial court granted summary judgment on each of Metro's three motions and dismissed Clevco's complaint in its entirety.

Although the trial court did not set forth its reasoning for the rulings in favor of Metro, the parties agree in their

briefs that the basis for the trial court's ruling was the finding that one of the provisions of the contract between Clevco and Metro placed all risks for increased costs arising out of unanticipated utility conflicts on Clevco. The parties also stated that, as an alternative basis for its ruling, the trial court relied on the case of *Dravo Corp. v. Metropolitan Seattle*, 79 Wn.2d 214, 484 P.2d 399 (1971) as placing the burden of such costs on the contractor as a matter of law. Because we disagree with the trial court's interpretation of the contract and its interpretation of *Dravo*, we reverse the trial court's ruling and remand for further proceedings.

## DISCUSSION

■ In reviewing a summary judgment the appellate court engages in the same inquiry as the trial court. *Sisters of Providence v. Snohomish Cy.*, 57 Wn. App. 848, 850, 790 P.2d 656 (1990). The present case presents questions of whether there is ambiguity in the contract between Metro and Clevco and of the legal effect of that written instrument. In general, these are questions of law, and will be reviewed as such on appeal. *McGary v. Westlake Investors*, 99 Wn.2d 280, 661 P.2d 971 (1983); *Yeats v. Estate of Yeats*, 90 Wn.2d 201, 580 P.2d 617 (1978).

## I

The contractual provision relied upon by the trial court is section 1.18. That provision states:

Existing Utilities.

In general, the location of existing major utilities, whether above–ground or underground, are indicated on the drawings. This information has been obtained from utility maps and field surveys provided by the Municipality. The Municipality does not guarantee the accuracy or completeness of this information, and it is to be understood that other aboveground or underground facilities not shown on the drawings may be encountered during the course of the work. In any case, minor lines such as water, gas and sewer services, and sprinkler irrigation lines are not all indicated.

Underground utility service lines, including but not limited to, sanitary sewer services, gas services, water services, house or

yard drains, and electric or telephone services, shall be maintained, relocated, rerouted, removed, and restored by the Contractor with the least possible interference with such services and in no case shall the interference of such service lines be considered for extra compensation. For purposes of definition, services are defined as utilities extending from the utility in right–of–way or easement to the abutting private property.

Existing aboveground utilities, including but not limited to power transmission and distribution, telegraph, telephone, and traffic control systems, whether shown on the drawings or not, shall be maintained, relocated, rerouted, removed, and restored without extra cost as may be necessary by the Contractor in a manner satisfactory to owners and operators of the utilities and to the Municipality.

Existing major underground utilities and appurtenant structures, whether shown on the drawings or not, shall be maintained, relocated, rerouted, removed, and restored by the Contractor in a manner satisfactory to owners and operators of the utilities and to the Municipality. The Contractor shall arrange with the owners and operators of the respective utility systems to mark the location and, if necessary or prudent, to expose the existing utilities prior to construction of the facilities contained in this contract.

The right is reserved by owners of public utilities and franchises to enter upon any street, road, right–of–way, or easement for the purpose of maintaining their property and for making necessary repairs or changes caused by the work. *Except as noted above, all costs thus incurred shall be paid by the Contractor.*

(Italics ours.) The italicized sentence is the core of the controversy. Clevco maintains that it applies only to the preceding sentence in this fifth unnumbered paragraph. Metro maintains that it applies to all of the preceding material in the provision. How it was meant to apply is less than clear. The "except as noted" language does not fit either argument. There is no notation in the previous sentence for this language to refer to, and the only notations in the preceding paragraphs all allocate costs to Clevco. If the "except as noted" language is ignored, the last paragraph makes sense and allocates all costs incurred as a result of *utility repairs* necessitated by the construction to the contractor. This fits well with the second and third unnumbered paragraphs

which clearly allocate costs of maintaining utility service lines and existing aboveground utilities to the contractor.

However, *if* this is the correct interpretation to be given section 1.18, it still fails to address the controversy underlying the present case; that is the question of the allocation of costs associated with design changes and/or increased work resulting from *major* utility conflicts with the construction project.[1] A separate contract provision, section B2.06, would seem to apply to that issue. This section provides:

RIGHT TO ISSUE CHANGE ORDERS

A. If for any reason it may become desirable during the course of the work to change the alignment, dimensions or design of the work, or any other aspect of the work, the Municipality reserves the right to issue change orders to give effect to such changes as may be necessary or desirable. Such change orders will be without effect unless issued in writing by the Municipality. The changes may or may not result in a change in the amount of work. If the changes do change the amount of work, the contract price shall be adjusted as extra work or work and material omitted, as the case may be.

If the Contractor contends that a change requires extra work, he shall so notify the Municipality in writing before the change is complied with. The Contractor's compliance with the change without such notice shall constitute his acknowledgement that such change does not involve extra work and that he is not entitled to any additional compensation as a result of the change. If the Contractor gives the required notice that the change requires extra work, the additional compensation to be paid to the Contractor, if any, shall be determined as set forth in Subsection B7.03.

B. The Engineer may instruct the Contractor to make minor changes in the construction where such changes are, in the opinion of the Engineer, not inconsistent with the purposes of the contract documents and where such changes do not involve any additional cost for the work to be furnished. The Contractor shall make no such minor changes without receipt of a written Engineer's instruction setting forth the minor changes to be made and the Contractor's compliance therewith shall constitute his acknowledgement that such minor changes will

---

[1] We do not agree with Metro's assertion that various other cited contract provisions unequivocally place the risk of loss on Clevco for unanticipated utility conflicts.

542

not result in any additional cost for construction. If the Contractor contends that the minor changes requested by the Engineer will result in additional cost for construction, the Contractor shall so notify the Municipality in writing, and the additional compensation to be paid to the Contractor, if any, shall be determined as set forth in Subsection B7.03.

■ Metro's citation of *Brady Contracting Co. v. West Manchester Township Sewer Auth.*, 97 Pa. Commw. 31, 508 A.2d 1287 (1986), *appeal denied*, 524 A.2d 495 (1987) is inapposite for the proposition that the allocation of the burden of locating the utilities to Clevco precludes the invocation of the change order provision relating to work resulting from utility conflicts. The *Brady* case is in accord with *Sime Constr. Co. v. WPPSS*, 28 Wn. App. 10, 621 P.2d 1299 (1980), *review denied*, 95 Wn.2d 1012 (1981), in holding that *failure to comply* with the requirements of the change order provision is fatal to a later claim for compensation based on extra work.

II

The parties have stated that, in the alternative, the trial court relied on *Dravo Corp. v. Metropolitan Seattle, supra*, as establishing a general rule allocating costs from unexpected conditions to the contractor. Metro argues that *Dravo* stands for the proposition that, absent an express contractual provision shifting the costs to the project owner, the contractor bears the risk of unforeseen underground conditions. Clevco argues that if this is *Dravo's* holding, it has been superseded by RCW 19.122.040. We find both positions to be inaccurate.

■ The general rule of *Dravo* was stated in *Nelson Constr. Co. of Ferndale, Inc. v. Port of Bremerton*, 20 Wn. App. 321, 328–29, 582 P.2d 511, *review denied*, 91 Wn.2d 1002 (1978):

> The general rule is that where plans or specifications lead a public contractor reasonably to believe that conditions represented therein do exist and may be relied upon in bidding, he is entitled to compensation for extra expense incurred as a result of the inaccuracy of those representations. *Dravo Corp. v. Municipality of Metropolitan Seattle*, 79 Wn.2d 214, 484 P.2d 399 (1971). The liability is premised upon the contractor's

reasonable reliance upon inaccurate representations, and the reliance will be deemed reasonable if the contractor has made a reasonable investigation under the circumstances. *Robert E. McKee, Inc. v. Atlanta,* 414 F. Supp. 957 (N.D. Ga. 1976).

In *Dravo* the contract in question expressly placed the risk of unexpected soil conditions on the contractor and expressly denied a warranty as to the accuracy of its representations of soil conditions. Thus, contrary to Metro's assertion, *Dravo* does not stand for a general rule that, absent a specific contractual provision, the contractor bears the risk of unexpected conditions. The general rule as restated in *Nelson* is quite nearly the reverse, and the issue of recovery is determined by the question of whether the contractor's reliance on contractual representations was reasonable.[2]

However, we also reject Clevco's argument that RCW 19.122.040 requires that the project owner bear the risk of utility conflicts not shown on the project plans. Clevco's assertion appears to be based on a simple misreading of the statute. The cited provision requires the project owner to indicate on project plans the *known* utilities. RCW 19.122.040(1). An underground utility not indicated on the plans is referred to as a changed or differing site condition. RCW 19.122.040(1)(b). The statute then provides that nothing in this chapter prevents the parties from contracting with respect to the allocation of risk for changed or differing site conditions. RCW 19.122.040(3). The true purpose of the chapter appears to be embodied in RCW 19.122.030 which provides a mechanism for locating all underground utilities prior to actual excavation, and this

---

[2]This assessment of *Dravo* as allowing recovery for extra expenses if reliance on the contract representations is found to be reasonable has been the view adopted by those courts which have assessed *Dravo's* meaning. *See Eastern Tunneling Corp. v. Southgate Sanitation Dist.,* 487 F. Supp. 109, 116–17 (D. Colo. 1980); *Robert E. McKee, Inc. v. Atlanta,* 414 F. Supp. 957, 960–61 (N.D. Ga. 1976); *Modern Builders, Inc. v. Manke,* 27 Wn. App. 86, 95, 615 P.2d 1332 (1980) (adding that reliance is not reasonable if the additional work was foreseeable); *Nelson Constr. Co. of Ferndale, Inc. v. Port of Bremerton,* 20 Wn. App. 321, 328–29, 582 P.2d 511, *review denied,* 91 Wn.2d 1002 (1978).

section puts the burden on the excavator to contact the utility operators. This statutory language simply does not support Clevco's contention that a project owner is required to locate all utilities and to mark all conflicts on the project construction plans.

### III

The trial court here based its ruling on its reading of section 1.18 of the construction contract as unambiguously allocating all costs from major utility conflicts to Clevco. As previously stated, we find section 1.18 to be ambiguous in its allocation of costs arising from major utility conflicts. Similarly, we do not agree with the trial court's assessment of the holding of *Dravo Corp. v. Metropolitan Seattle, supra,* as establishing this risk allocation as a matter of law. However, the record presented on appeal is not sufficient to permit this court to go beyond these rulings and engage in its own construction of the contract as a matter of law. Accordingly, we express no opinion as to the validity of Clevco's claims under the contract theories or under its proffered noncontract and consequential claims theories. Because the trial court erroneously found that all questions of duty were unambiguously determined by section 1.18 we reverse the trial court's order granting summary judgment as to all three groups of theories and remand the matter for further proceedings.

GROSSE, A.C.J., and PEKELIS, J., concur.

Reconsideration denied March 13, 1991.

Review by Supreme Court pending May 15, 1991.